**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| MICHAEL SLAGER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:15-cv-04536-DCN |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| SOUTHERN STATES POLICE | ) | |
| BENEVOLENT ASSOCIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on plaintiff Michael Slager's ("Slager") motion to seal and motion for a protective order pursuant to Federal Rule of Civil Procedure 26(c). For the reasons set forth below, the court grants Slager's motions.

## I.  BACKGROUND

Slager is a resident of South Carolina, Compl. ¶ 1, and defendant Southern States Police Benevolent Association, Inc. ("the PBA") is a tax-exempt labor organization, incorporated and existing under the laws of Georgia, Answer ¶ 4, that was formed to further the interests of its police officer members, Def.'s Resp. 1.  The PBA offers a legal defense benefit policy to its members in South Carolina.  Pl.'s Mot. 1; Def.'s Resp. 1. Slager, who was an officer with the City of North Charleston Police Department at the time, initially purchased a legal defense benefit policy from the PBA on October 13, 2011, but elected to discontinue the policy in June 2012.  Compl. ¶¶ 8–9, 27. Nevertheless, Slager reinstated the policy on January 31, 2013, and continued to pay his $23.50 monthly premium through April 2015.  Id. ¶ 10.  The policy, in pertinent part, stated that the PBA would provide legal representation to its "members only in those

1

cases where a lawsuit or criminal accusation results from professional acts or omissions which arise out of and in the scope of their duties as a law enforcement officer." Pl.'s Mot., Ex. A ¶ A. Under the policy, the legal defense benefit "consist[ed] of payment by [the PBA] of attorney's fees and directly related [c]ourt costs." Id. ¶ B.

On April 4, 2015, Slager was involved in an officer-related shooting that resulted in the death of Walter Scott ("the Walter Scott incident"). Pl.'s Mot. 2. At the time of the incident, Slager had a wallet card issued by the PBA that provided an emergency telephone number for him to call to obtain an attorney. Id. at Ex. B. Per the instructions on the wallet card, Slager called the PBA emergency line to report the shooting and spoke with John Midgette ("Midgette"), a nonlawyer employee of the PBA who was on call at the time. Id. at 2; Def.'s Resp. 2. According to Slager, the call was for the express purpose of securing legal representation pursuant to the legal defense benefit policy. Pl.'s Mot. 2.

Following the telephone conversation with Slager, Midgette assigned attorney David Aylor ("Aylor") to represent Slager. Id. Thereafter, Slager gave a statement regarding the incident to the South Carolina State Law Enforcement Division ("SLED") in Aylor's presence. Def.'s Resp. 2. Upon completion of the oral statement, Slager and Aylor made plans to meet with SLED again to submit a written statement. Id. at 3. When the two met with SLED on April 7, 2015, officers showed them a video of the incident, after which Slager refused to complete a written statement and was placed under arrest. Id. Aylor withdrew from representation on the same day. Id.; Pl.'s Mot. 2. Slager then contacted the PBA and asked for a replacement lawyer, but in a letter dated April 8, 2015, the PBA informed Slager it would no longer "provide [him] representation

2

in this matter due to the intentional violation of [the] policy/law exclusion."[1]  Exhibit 1

attached hereto.

After the PBA declined to hire a replacement lawyer for Slager, he filed the

instant lawsuit on November 10, 2015, alleging claims for breach of contract, bad faith,

and unfair insurance practices.  Def.'s Resp. 3; Compl. ¶¶ 50–85.  The PBA filed an

answer on December 14, 2015, denying liability.  ECF No. 7.  As part of discovery,

Slager first deposed Dale Preiser ("Preiser"), an employee of the PBA.  Def.'s Resp. 3.

Slager asked Preiser to justify the PBA's refusal to appoint a replacement lawyer for him,

and Preiser referenced the SLED video and the statements Slager made to Midgette on

the date of the incident.  Def.'s Resp., Ex. G, Dep. Dale Preiser 72–89.  Following

Preiser's deposition, on June 8, 2016, Slager filed a motion to seal and motion for a

protective order "restricting the [PBA] from referencing, disclosing[,] or otherwise using

communications between parties which are protected by the attorney client privilege."

ECF No. 23.  Subsequently, during Slager's deposition on June 13, 2016, the PBA asked

questions regarding information Slager communicated to Midgette while trying to secure

legal representation.  Pl.'s Mot. 2.  The PBA also inquired as to Slager's current home

address.  Id.  Slager's counsel objected to the line of questioning and instructed Slager

not to answer.  Id.

Slager's counsel consulted with opposing counsel pursuant to Local Rule 7.02,

but the parties were unable to resolve the matter.  Id.  Therefore, Slager filed the present

---

[1] It seems a might curious that an insurer, who issues a policy that supposedly covers a criminal accusation on the one hand, can withdraw benefits if a member "has committed an intentional, deliberate and/or illegal act . . . criminally."  But this is a question for another day.

motion for a protective order on June 20, 2016. ECF No. 24. Slager seeks a protective

order to prevent the PBA from using or otherwise disclosing any communication between

him and Midgette regarding the Walter Scott incident. Id. at 5. In addition, Slager seeks

to protect his home address from disclosure for the safety of his family. Id. at 6. The

PBA filed a memorandum in opposition to Slager's motion on June 27, 2016, ECF No.

25, and the court held a hearing on July 18, 2016. The motion has been fully briefed and

is ripe for the court's review.

## II.  STANDARD

Federal Rule of Civil Procedure 26(b)(1) limits the scope of discovery to "any

nonprivileged matter that is relevant to any party's claim or defense." "The court may,

for good cause, issue an order to protect a party or person from annoyance,

embarrassment, oppression, or undue burden and expense" by forbidding or limiting the

scope of discovery. Fed. R. Civ. P. 26(c)(1). "The scope and conduct of discovery are

within the sound discretion of the district court." Columbus-Am. Discovery Grp. v. Atl.

Mut. Ins. Co., 56 F.3d 556, 568 n.16 (4th Cir. 1995); see also U.S. ex rel. Becker v.

Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002) (stating district

courts are afforded "substantial discretion . . . in managing discovery").

"The party moving for a protective order bears the burden of establishing good

cause." Webb v. Green Tree Servicing, LLC, 283 F.R.D. 276, 278 (D. Md. 2012).

"Normally, in determining good cause, a court will balance the interest of a party in

obtaining the information versus the interest of his opponent in keeping the information

confidential or in not requiring its production." UAI Tech., Inc. v. Valutech, Inc., 122

F.R.D. 188, 191 (M.D.N.C. 1988). In other words, the district court "must weigh the

4

need for the information versus the harm in producing it."  <u>A Helping Hand, LLC v.</u>

<u>Baltimore Cty., Md.</u>, 295 F. Supp. 2d 585, 592 (D. Md. 2003) (quoting <u>Valutech</u>, 122

F.R.D. at 191).  The district court, however, is afforded broad discretion "to decide when

a protective order is appropriate and what degree of protection is required."  <u>Seattle</u>

<u>Times Co. v. Rhinehart</u>, 467 U.S. 20, 36 (1984).

Local Rule 30.04(C) provides that "[c]ounsel shall not direct or request that a

witness not answer a question, unless that counsel has objected to the question on the

ground that the answer is protected by a privilege. . . ."  The rule further states that

"[c]ounsel directing that a witness not answer a question on those grounds or allowing

their clients to refuse to answer a question on those grounds shall move the court for a

protective order under Fed. R. Civ. P. 26(c) or 30(d)(3) within seven (7) days of the

suspension or termination of the deposition."  <u>Id.</u>  "When a party withholds information

otherwise discoverable by claiming that the information is privileged . . . , the party must:

(i) expressly make the claim; and (ii) describe the nature of the documents,

communications, or tangible things not produced or disclosed—and do so in a manner

that, without revealing information itself privileged or protected, will enable other parties

to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).

### III.  DISCUSSION

Slager filed a motion to seal and motion for a protective order to prevent the PBA

from using or otherwise disclosing any communication between Slager and the PBA

regarding the Walter Scott incident.  According to Slager, these communications are

protected by the attorney-client privilege and implicate his Fifth Amendment privilege

against self-incrimination.  Slager further contends his statements to Midgette are

irrelevant because the PBA, in defending its decision to deny him the legal defense benefit under the policy, is precluded from pursuing a different defense from that which it asserted in the April 8, 2015 denial letter.  The PBA, on the other hand, argues it is entitled to use Slager's statements to defend itself in the instant lawsuit.

In Washington v. National Service Fire Insurance Co., the Supreme Court of South Carolina considered whether an insurer was bound by the defense asserted in its letter denying coverage under an automobile insurance policy.  168 S.E.2d 90 (S.C. 1969).  The insured in Washington had promptly given notice of the accident in question to the insurer, but the insurer denied coverage, arguing the substitution of the "owned automobile" under the policy relieved it of liability with respect to the collision.  Id. at 92.  Notwithstanding the reason offered in the denial letter, the insurer subsequently sought to "assert[] as a defense that it was not given notice of the Washington claim, nor were the suit papers forwarded to it as required by the policy."  Id.

The Washington court noted "[i]t is well settled that an insurer which has denied coverage on some other basis is precluded from defending against an action on a liability policy on the ground that the insured failed to comply with its requirements as to notice and the forwarding of suit papers."  Id.  According to the court, "[t]he purpose of these policy requirements is to 'enable the insurer to inform itself promptly concerning the accident, to investigate the circumstances, and prepare a timely defense, if necessary on behalf of the insured.  Compliance with such a provision is unnecessary and serves no good purpose where the insurer has disclaimed liability under the policy.'"  Id. at 93. Because the insurer denied coverage on the ground that the vehicle listed in the policy had been effectively substituted for another vehicle prior to the accident, the court held

6

that the insurer was precluded from relying upon any of the insured's omissions

regarding notice and the forwarding of suit papers as a policy defense against the insured

in that case.  Id.

Applying the Washington court's reasoning to the facts of the instant case, the

court finds the PBA is precluded from asserting as a defense that it denied the legal

defense benefit based upon Slager's alleged misrepresentations to Midgette regarding the

Walter Scott incident.  In the letter denying coverage, the PBA stated the following:

> Upon review of your case, please be advised that the P.B.A.
> will be unable to provide representation in this matter due
> to the intentional violation of [the] policy/law exclusion.

> Southern States P.B.A. policy states as follows:

> "Southern States P.B.A. reserves the right to withhold
> approval of any benefits and to withdraw approval of any
> benefits if it is determined at any time that the member has
> committed an intentional, deliberate and/or illegal act,
> either civilly, criminally, or administratively."

Order, Ex. 1.

Thus, it is clear from the denial letter that the sole basis upon which the PBA

sought to deny Slager the legal defense benefit was its belief that Slager's actions during

the Walter Scott incident were "intentional, deliberate and/or illegal" and, as such, were

excluded from coverage under the policy.  The letter makes no mention of Slager failing

to cooperate, failing to provide truthful and relevant information, or otherwise violating

any duties set forth in the policy.  As a result, under Washington, the PBA is precluded

from asserting Slager's allegedly untruthful conversations with Midgette led it to deny

the legal defense benefit to Slager.  168 S.E.2d at 92 ("It is well settled that an insurer

which has denied coverage on some other basis is precluded from defending against an

7

action on a liability policy on the ground that the insured failed to comply with its requirements as to notice and the forwarding of suit papers"); see also, e.g., Cox v. Reliance Standard Life Ins. Co., 43 F. App'x 606, 610 (4th Cir. 2002) (holding an insurer waived the right to argue the insured's death was not an accident and, thus, not covered by the policy given that the insurer's letter denying the beneficiary's claim for accidental death benefits stated only that, pursuant to a policy exclusion, the loss was not covered because the insured was engaged in a felony at the time of his death). Because the PBA is precluded from asserting this defense, the court finds Slager's conversations with Midgette are simply irrelevant to the case at hand. See Fed. R. Civ. P. 26(b)(1) (limiting the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense").

The court further finds the potential harm that could arise from the introduction of Slager's statements—namely, the possible implications it could have on the indictments pending in state and federal court—far outweighs any interest in using this evidence to substantiate a defense that the PBA, as a matter of law, is precluded from asserting. See A Helping Hand, LLC, 295 F. Supp. 2d at 592 (stating the court "must weigh the need for the information versus the harm in producing it" (quoting Valutech, 122 F.R.D. at 191)); Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1202 (Fed. Cir. 1987) (providing the court "has the discretion to . . . impose protective orders and conditions 'when the interests of justice seem[] to require such action'" (quoting Sec. & Exch. Comm'n v. Dresser Indus., Inc., 628 F.2d 1368, 1375 (D.C. Cir. 1980), cert. denied, 449 U.S. 993 (1980))); Washington, 168 S.E.2d at 92 (stating "an insurer which has denied coverage on some other basis is precluded from defending against an action on a liability policy on

8

the ground that the insured failed to comply with its requirements as to notice and the forwarding of suit papers"). The court acknowledges that a protective order is not necessarily required for Slager to assert his Fifth Amendment privilege against self-incrimination. See In re Grand Jury Subpoena, 836 F.2d 1468, 1471 (4th Cir. 1988) (holding that, "[a]bsent a grant of immunity, the deponents were entitled, with or without a protective order, to assert their [F]ifth [A]mendment privilege in answer to potentially incriminating questions in a civil proceeding"). Slager, of course, may exercise this privilege at any time. See id. Nevertheless, the court finds the irrelevance of the information the PBA seeks to introduce—coupled with the potential harm its revelation could cause Slager in the pending criminal indictments—constitutes "good cause" for the court to issue a protective order in this matter. See Webb, 283 F.R.D. at 278 (stating that a "party moving for a protective order bears the burden of establishing good cause"); Valutech, 122 F.R.D. at 191 ("Normally, in determining good cause, a court will balance the interest of a party in obtaining the information versus the interest of his opponent in keeping the information confidential or in not requiring its production.").

Finally, Slager asks the court to issue a protective order permitting him to refuse to disclose his home address, arguing such a measure is necessary for the safety of his family. In his memorandum in support of the motion, Slager notes that the state court "did not require [him] to list his current address on the bond paperwork because his previous home was firebombed." Pl.'s Mem. Supp. 6. Frankly, the court sees no reason why the PBA needs this information because—as Slager notes—his attorney will accept service on his behalf and he is under the confines of a criminal bond. Id. More importantly, the release of Slager's address could endanger the safety of his family.

9

Given that the potentially harmful consequences of requiring Slager to produce his current home address far outweigh the PBA's need for such information to defend itself in this lawsuit, the court finds Slager has shown good cause as to why he should not be required to disclose it. See A Helping Hand, LLC, 295 F. Supp. 2d at 592 (stating that, in deciding whether to issue a protective order, the court "must weigh the need for the information versus the harm in producing it" (quoting Valutech, 122 F.R.D. at 191)).

### IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** Slager's motion for a protective order to protect from disclosure his current home address as well as any statements he made to Midgette regarding the Walter Scott incident.  In light of the court's decision as to this issue, the court finds Slager's motion to seal is **MOOT**.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 3, 2016**
**Charleston, South Carolina**